**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| FRANK J. ALLEN, JR., et al. | : | |
| | : | |
| | : | |
| v. | : | Civil No. CCB-10-2740 |
| | : | |
| | : | |
| CITIMORTGAGE, INC. | : | |
| | : | |
| | : | |

## MEMORANDUM

Frank and Anne-Christine Allen have sued CitiMortgage, Inc. ("CitiMortgage") for claims arising out of the denial of the plaintiffs' request for a permanent modification of their mortgage loan. The plaintiffs' claims include breach of contract, promissory estoppel, breach of fiduciary duty, violation of the Maryland Consumer Protection Act, violation of the Maryland Consumer Credit Reporting Agency Act, and violation of the federal Fair Credit Reporting Act. Now pending before the court is the defendant's motion to dismiss. The issues in this case have been fully briefed and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2010). For the following reasons, the defendant's motion will be granted in part and denied in part.

## BACKGROUND

The Allens purchased their family home in Rising Sun, Maryland in January 2004. In April 2007, the Allens refinanced their original mortgage loan in the amount of $417,000, with MidAtlantic Farm Credit, ACA. CitiMortgage serviced the refinanced mortgage. Although both Mr. and Mrs. Allen are signatories to the deed of trust for the refinancing, only Mrs. Allen is named as a borrower on the promissory note, dated April 3, 2007.

Beginning in late 2008, the Allens began struggling to make their mortgage payments. In May 2009, they contacted CitiMortgage to initiate the process for obtaining a modification of their mortgage under the Home Affordable Modification Program ("HAMP"), a program established by the Treasury Department under the Troubled Asset Relief Program ("TARP"). The purpose of HAMP was to help "3 to 4 million at-risk homeowners—both those who are in default and those who are at imminent risk of default" avoid foreclosure "by reducing monthly payments to sustainable levels." (HAMP Suppl. Directive 09-901 at 1, Def's Mot. to Dismiss, Ex. 3.) HAMP allows at-risk homeowners to obtain permanent loan modifications, by which their monthly mortgage payments are reduced to not more than 31% of their monthly income for a period of at least five years. Although participation in HAMP is required for government-sponsored entities ("GSEs"), such as Fannie Mae and Freddie Mac, participation in HAMP is voluntary for non-GSEs. Non-GSE mortgage servicers that elect to participate in HAMP are required to enter into a Servicer Participation Agreement ("SPA") with the federal government, which expressly incorporates the HAMP guidelines, procedures, and supplemental directives issued by the Treasury Department. Mortgage servicers receive $1,000 from the government as an incentive payment for each permanent loan modification they offer. CitiMortgage executed an SPA on April 13, 2009. (*See* Def.'s Mot. to Dismiss Ex. 4.)

The HAMP loan modification process occurs in two steps. First, the mortgage servicer determines whether the borrower is eligible to participate in HAMP.[1] If a mortgage servicer

---

[1] Prior to June 1, 2010, a mortgage servicer could determine a borrower's eligibility either by relying on unverified financial information provided orally by the borrower or by requiring the borrower to submit documentation to prove income status. (*See* HAMP Suppl. Directive 09-901 at 6, 17.) Because mortgage servicers were not required to verify a borrower's financial information prior to offering a Trial Period Plan ("TPP"), a number of borrowers who were initially offered TPPs were later found to be ineligible for permanent loan modifications under HAMP. To remedy this issue, the Treasury Department issued a Supplemental Directive, effective June 1, 2010, requiring

determines that the borrower is eligible for HAMP, the servicer may offer the borrower a three-month Trial Period Plan ("TPP"), during which the borrower pays reduced mortgage payments. If all of the conditions of the TPP Agreement are satisfied, the borrower may then proceed to step two of the process, at which point he or she is offered a permanent loan modification.

According to the plaintiffs, CitiMortgage approved them for a TPP in May 2009, which lowered their monthly mortgage payments from $2,776.00 per month to $1,914.17 per month. Based on the terms of the TPP Agreement, the Allens began paying the modified, lower payment of $1,914.17 per month in June 2009. In August 2009, however, they received a notice from CitiMortgage that their TPP Agreement was to begin on September 13, 2009. On September 10, 2009, the Allens received another letter from CitiMortgage stating that their TPP Agreement had been cancelled. When they called to ask CitiMortgage about the cancellation, they were told to disregard the letter.

The Allens continued to pay the modified, lower monthly payment on their mortgage, and received no information from CitiMortgage about the status of their HAMP application through December 2009. On December 28, 2009, the Allens received a letter from CitiMortgage stating that their account was delinquent in the amount of $8,328.42. The Allens immediately contacted CitiMortgage about the delinquency notice, but allegedly received no explanation as to why the notice was sent when their HAMP application was still under consideration and their TPP Agreement remained in effect. On February 15, 2010, the Allens received another letter from CitiMortgage stating that their account was now delinquent in the amount of $11,599.02.

---

mortgage servicers to fully verify a borrower's financial information before offering a TPP. *See* U.S. Dep't of Treasury, HAMP Supplemental Directive 10-01, *available at* https://www.hmpadmin.com/portal/news/docs/2010/ hampupdate012810.pdf. The Allens applied for a loan modification under the original scheme.

Finally, on February 25, 2010, the Allens received a letter from CitiMortgage denying them a permanent loan modification because the Allens had failed to document a financial hardship that either reduced their income or increased their expenses in a way that would impact their ability to make payments under the mortgage as originally agreed. (*See* February 25, 2010 Letter, Def.'s Mot. to Dismiss, Ex. 5.) Despite this denial letter, on March 8, 2010, the Allens received another letter from CitiMortgage requesting additional financial information for the permanent loan modification application, and leading the Allens to believe that CitiMortgage was reconsidering its February 25 denial letter. On March 8, 2010, the Allens also received a letter from CitiMortgage informing them that their loan was in default. After contacting CitiMortgage about this default notice, the Allens were again told to disregard the letter. On March 16, 2010, CitiMortgage terminated the Allens from the loan modification program entirely, meaning that they would have to resume their higher monthly mortgage payments.

On March 22, 2010, in the course of requesting a written reason for CitiMortgage's decision not to offer them a permanent loan modification, the Allens discovered that CitiMortgage had informed the credit reporting agencies that Mrs. Allen's mortgage payments were delinquent. From June through September 2009, CitiMortgage had reported Mrs. Allen as "paid as agreed" on her credit report. In October 2009, however, before the Allens were informed that their loan modification application was denied or that their TPP Agreement was cancelled, CitiMortgage began reporting Mrs. Allen as sixty days late on her mortgage payments. The Allens immediately informed the credit reporting agencies that they disputed the negative credit report. They also made numerous requests for CitiMortgage to change the status of Mrs. Allen's credit report. CitiMortgage has failed to take any action to remove the negative reporting

on her credit report.

On August 30, 2010, the Allens filed this action against CitiMortgage in the Circuit Court for Cecil County, Maryland. CitiMortgage removed the action to this court on October 4, 2010, based on diversity jurisdiction, and filed a motion to dismiss on January 31, 2011. The plaintiffs have opposed the motion.

## ANALYSIS

"[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks and alterations omitted) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir.1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and alterations omitted). Thus, the plaintiff's obligation is to set forth sufficiently the "grounds of his entitlement to relief," offering more than "labels and

conclusions." *Id.* (internal quotation marks and alterations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1950 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

### A.     Mr. Allen's Standing

The defendant argues that Mr. Allen lacks standing to assert any claims against CitiMortgage. To meet the constitutional requirement for standing, a plaintiff must allege that: "1) he or she suffered an 'injury in fact' that is concrete and particularized, and is actual or imminent; 2) the injury is fairly traceable to the challenged action of the defendant; and 3) the injury likely will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 396 (4th Cir. 2011) (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992))).

CitiMortgage argues that Mr. Allen lacks standing to assert any claims arising out of the mortgage because he was not a signatory on the promissory note securing the mortgage. Although the plaintiffs admit that Mr. Allen was not a signatory on the promissory note, they allege that both Mr. and Mrs. Allen were parties to the TPP Agreement with CitiMortgage. (*See* Am. Compl. ¶¶ 33-35.) While the defendant contends that this allegation is "illogical" because Mr. Allen would have no right to modify an existing debt instrument to which he was not a party, (*see* Def.'s Reply at 5), it has provided no contrary factual evidence to dispute the plaintiffs' allegations. At this stage, the court must accept as true the plaintiffs' allegation that Mr. Allen was a party to the TPP Agreement. If CitiMortgage breached the TPP Agreement to which Mr.

Allen was a party, then he suffered an injury-in-fact arising out of CitiMortgage's breach of contract. It is irrelevant whether Mr. Allen was a signatory on the promissory note. He has standing to assert claims against CitiMortgage stemming from the alleged breach of the TPP Agreement (Counts I-V).[2]

### B. Breach of Contract – TPP Agreement (Count I)

As an initial matter, CitiMortgage argues that the plaintiffs lack standing to bring claims associated with the HAMP program because Congress did not grant borrowers a private right of action under the HAMP guidelines. Numerous courts have held that borrowers do not have an express or implied private right of action under HAMP. *See, e.g.*, *Hart v. Countrywide Home Loans, Inc.*, 735 F. Supp. 2d 741, 748 (E.D. Mich. 2010) (citation omitted).[3] In response, the plaintiffs argue that they are not attempting to assert a private right of action under HAMP, but are instead pursuing state law claims against CitiMortgage that are independent of HAMP. While CitiMortgage acknowledges that the plaintiffs have brought state law claims against it for breach of the TPP Agreement, it argues that the plaintiffs are improperly trying to use state law claims to enforce HAMP.

CitiMortgage appears to argue that a borrower can never enforce rights stemming from a TPP Agreement because such agreements were created as part of HAMP, which does not contemplate a private right of action. The court disagrees. In the only reported case to have addressed such an argument, a federal district court in the District of Massachusetts squarely

---

[2] CitiMortgage also challenges Mr. Allen's statutory standing to assert claims under state and federal credit reporting statutes. These arguments will be addressed below.

[3] *See also Acuna v. Chase Home Finance, LLC*, No. 10-905, 2011 WL 1883089, at *4 (E.D. Va. May 17, 2011); *Bourdelais v. J.P. Morgan Chase Bank, N.A.*, No. 10-670, 2011 WL 1306311, at *3 (E.D. Va. Apr. 1, 2011); *Phipps v. Wells Fargo Bank, N.A.*, No. 10-2025, 2011 WL 302803, at *9 (E.D. Cal. Jan. 27, 2011); *Marks v. Bank of America, N.A.*, No. 10-08039, 2010 WL 2572988, at *6-7 (D. Ariz. June 22, 2010).

rejected the notion that a plaintiff could never enforce terms provided in a TPP Agreement solely because the agreement originated under HAMP. *See Bosque v. Wells Fargo Bank, N.A.*, --- F. Supp. 2d ----, 2011 WL 304725, at *5 (D. Mass. 2011). In *Bosque*, the court explained:

> [D]efendant contends that because the TPP's originated out of the HAMP program, plaintiff cannot vindicate any rights that relate to HAMP. That argument is plainly without merit. . . . The fact that a TPP has a relationship to a federal statute and regulations does not require the dismissal of any state-law claims that arise under a TPP. Nor does the fact that the TPP is a form contract created by the government change that analysis. If the TPP is properly construed as a contract between the parties in this case, then plaintiffs have standing to bring suit in order to recover for any breach of that contract.

*Id.*

Even courts that have found HAMP to preclude borrowers from asserting a private right of action have not gone so far as to declare that plaintiffs cannot assert state law claims involving TPP Agreements merely because they originated under HAMP. *See, e.g.*, *Vida v. OneWest Bank, F.S.B.*, No. 10-987, 2010 WL 5148473, at *5 (D. Or. Dec. 13, 2010) ("The court agrees with the district courts in this circuit that HAMP does not authorize a private right of action against participating lenders. That said, the court does not agree with Defendants' premise that they are wholly immunized for their conduct so long as the subject of the transaction is associated with HAMP."). Courts that have dismissed a breach of contract claim brought under a TPP Agreement, have done so, at least in part, because the borrower failed to allege that he or she satisfied all of the conditions set forth in the TPP Agreement, or because compliance with the TPP did not guarantee a permanent loan modification. *See, e.g.*, *Morales v. Chase Home Finance LLC*, No. 10-02068, 2011 WL 1670045, at *6 (N.D. Cal. Apr. 11, 2011) (holding that the plaintiff had failed to allege that they had met all the conditions set forth in the TPP Agreement, including receipt of a fully executed copy of a modification agreement); *Bourdelais*, No. 10-670,

2011 WL 1306311, at *5 (explaining that the TPP Agreement's language does not guarantee a permanent loan modification to the borrower); *Vida*, No. 10-987, 2010 WL 5148473, at *6 (same). Thus, even if a private right of action does not exist under HAMP, the Allens may be permitted to assert a breach of contract claim stemming from the TPP Agreement as long as they have stated a proper claim in their amended complaint. *See Bosque*, --- F. Supp. 2d ----, 2011 WL 304725, at *5.[4]

Under Maryland law, to state a claim for breach of contract, a plaintiff must plead the existence of a contractual obligation owed by the defendant to the plaintiff, and a material breach of that obligation. *See RRC Northeast, LLC v. BAA Maryland, Inc.*, 994 A.2d 430, 442 (Md. 2010). Moreover, contracts ordinarily require consideration to be binding and enforceable. *See Cheek v. United Healthcare of Mid-Atlantic, Inc.*, 835 A.2d 656, 661 (Md. 2003). Consideration may consist of "a benefit to the promisor or a detriment to the promisee." *Id.* (internal quotation marks and citation omitted). Past consideration, however, will not support a new agreement. *See Wickman v. Kane*, 766 A.2d 241, 246 (Md. Ct. Spec. App. 2001).

The Allens allege that the TPP Agreement between the parties included the following terms: (1) if the plaintiffs failed to make even one of the newly reduced monthly payments, they would be ineligible for a permanent loan modification; (2) the defendant would process the plaintiffs' application in compliance with the HAMP guidelines; (3) the defendant would refrain from making inconsistent and contradictory statements and representations to the plaintiffs; and (4) the defendant would not harm Mrs. Allen's credit score as long as they remained in

---

[4] *See also Wittenberg v. First Indep. Mortgage Co.*, No. 10-58, 2011 WL 1357483, at *20 (N.D. W. Va. April 11, 2011) ; *Locke v. Wells Fargo Home Mortgage*, No. 10-60286, 2010 WL 4941456, at *3 n.2 (S.D. Fla. Nov. 30, 2010); *Durmic v. J.P. Morgan Chase Bank, NA*, No. 10-10380, 2010 WL 4825632, at *2 n.9 (D. Mass. Nov. 24, 2010).

compliance with the TPP Agreement. (*See* Am. Compl. ¶ 35.) Because neither party has attached a copy of the TPP Agreement at issue here, the court must accept the terms of the TPP Agreement as pled in the amended complaint to be true.[5] The Allens allege that they met their requirements under the TPP Agreement by making all of their reduced monthly payments, and that CitiMortgage breached its obligations by failing to properly and timely process their application, by failing to offer them a permanent modification under HAMP, and by untruthfully reporting to credit reporting agencies that Mrs. Allen was delinquent in her payments. (*See id.* at ¶ 69.)

CitiMortgage argues the plaintiffs' breach of contract claim must fail because the contract lacked any consideration. CitiMortgage is correct that the modified loan payments paid by the Allens do not constitute consideration to support the TPP Agreement. *See Glenwood Range Co. v. Universal Major Elec. Appliances*, 124 F. Supp. 103, 117 (D. Md. 1954) (noting that "a debtor incurs no legal detriment and a creditor receives no benefit when the debtor pays that which he already owes."). It appears from *Bosque*, however, that other forms of consideration arise under the language of the TPP. *See Bosque*, -- F. Supp. 2d ----, 2011 WL 304725, at *6 (explaining that under a TPP, plaintiffs were "required to provide documentation of their current income, make legal representations about their personal circumstances, and agree to undergo credit counseling if requested to do so . . . . [and] could also be required to make payments into a newly established escrow account.") (quoting *Durmic v. J.P. Morgan Chase Bank, NA*, No. 10-10380, 2010 WL 4825632, at *3 (D. Mass. Nov. 24, 2010)). Without the actual TPP to review, the court

---

[5] The court notes that the defendant has attached a sample TPP Agreement form to its Reply. It is unclear, however, whether this sample agreement is the same TPP Agreement that the parties allegedly entered into in May 2009. (*See* Def.'s Reply at Ex.1C.)

is not prepared to say consideration is completely lacking at this time.

CitiMortgage also argues that the plaintiffs' breach of contract claim must fail because it violates the Statute of Frauds. Under Maryland law, an action may not be brought "[o]n any agreement that is not to be performed within 1 year from the making of the agreement," unless either the contract, agreement, or "some memorandum or note of it, is in writing and signed by the party to be charged or another person lawfully authorized by that party." MD. CODE ANN., CTS. & JUD. PROC. § 5-901(3). When parties "expressly and specifically agree that their oral contracts are not to be performed within one year," the Statute of Frauds will bar any claims. *Friedman & Fuller, P.C. v. Funkhouser*, 666 A.2d 1298, 1304 (Md. Ct. Spec. App. 1995) (internal quotations and alterations omitted), *disapproved of on other grounds by Pavel Enter., Inc. v. A.S. Johnson Co. Inc.*, 674 A.2d 521 (Md. 1996). Here, the defendant is correct that any oral agreement to permanently modify the plaintiffs' original mortgage, which was for a term of 30 years, would be barred by the Statute of Frauds. The plaintiffs, however, do not allege that the TPP Agreement was a promise to permanently modify their loan. They instead allege that the TPP Agreement required CitiMortgage to process their application for a permanent loan modification in accordance with the HAMP Guidelines. (*See* Am. Compl. ¶ 35.) Because the TPP Agreement could have been performed within one year, and CitiMortgage did in fact process the plaintiffs' application within one year, the Statute of Frauds does not necessarily ban this claim.

In summary, while it is a close question, at this stage the Allens appear to have stated a plausible claim for breach of contract, and the defendant's motion to dismiss Count I will be denied so that discovery may proceed.

**C.      Breach of Contract – SPA Agreement (Count II)**

The Allens also allege that they may sue to enforce CitiMortgage's Servicer Participant Agreement ("SPA") with the government because they are third-party beneficiaries of the agreement. Federal law controls the interpretation of contracts to which the federal government is a party, and courts look to general contract principles when interpreting such contracts. *United States v. Seckinger*, 397 U.S. 203, 209-10 (1970). The Fourth Circuit has recognized that the "appropriate test under federal common law for third-party beneficiary status 'is whether the contract reflects the express or implied intention of the parties to benefit the third party.'" *Sec'y of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 706 (4th Cir. 2007) (quoting *Schuerman v. United States*, 30 Fed. Cl. 420, 433 (1994)). "As third-party beneficiary status is exceptional in the law, 'the privilege should not be granted liberally.'" *Id.* (quoting *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005)). Third-party beneficiary status is not, however, reserved only for parties who benefit expressly from a contract. *Id.* (quoting *Flexfab*, 424 F.3d at 1260). "If the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose." *Id.* (quoting *Roedler v. Dep't of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001)). Because the government generally acts in the public interest, when a third party benefits from a government contract, there is a presumption that the third party is an incidental beneficiary and has no right to enforce the contract. *S.E.C. v. Prudential Sec. Inc.*, 136 F.3d 153, 158 (D.C. Cir. 1998); *see also Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 1999) ("Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested.") (citation omitted).

Numerous courts have held that homeowners are incidental beneficiaries of SPAs and, therefore, have no right to bring third-party suits to enforce such contracts.[6] This court agrees. The SPA does not give a borrower rights under the contract. Indeed, the language of the SPA indicates that the parties to the agreement intended the opposite. The SPA states that the Federal Home Loan Mortgage Corporation ("Freddie Mac") is designated by the Secretary of the Treasury with the responsibility of ensuring that servicers comply with HAMP under an SPA. (*See* SPA Agreement at 1, Def.'s Mot. to Dismiss Ex. 4.) Moreover, the SPA states that all disputes arising under the agreement should be resolved internally by mutual agreement between the parties. (*See id.* at 7.) Given this language, recognizing a third-party beneficiary right to enforce the SPA would be contrary to the intent of the parties.

Even if borrowers were intended beneficiaries of SPAs, however, the Allens would be barred from asserting a breach of contract claim on this basis. The Supreme Court recently addressed the question whether a third-party beneficiary may sue to enforce a government contract when the statute giving rise to the contract provides no private right of action. In *Astra USA, Inc. v. Santa Clara Cnty., Cal.*, -- U.S. ----, 131 S. Ct. 1342 (2011), § 340B of the Public Health Services Act imposed ceilings on prices drug manufacturers could charge for medications sold to specified health care facilities, including public hospitals and community health centers. 130 S. Ct. at 1345. Section 340B gave enforcement authority to the Secretary of Health and Human Services ("HHS"), and did not provide a private right of action to 340B covered entities. *Id.* Drug manufacturers could opt-in to the 340B program by signing a Pharmaceutical Pricing

---

[6] *See, e.g.*, *Acuna*, No. 10-905, 2011 WL 1883089, at *4 (collecting cases) *Bourdelais*, No. 10-670, 2011 WL 1306311, at *3 (collecting cases); *Phipps*, No. 10-2025, 2011 WL 302803, at *8 (borrower was not an intended beneficiary of the bank's SPA with the government). *But see Marques v. Wells Fargo Home Mortgage, Inc.*, No. 09-1985, 2010 WL 3212131, at *6-7 (S.D. Cal. Aug. 12, 2010) (holding that borrower may be a third-party beneficiary of an SPA, but dismissing the borrower's claim based on insufficient pleading).

Agreement ("PPA"), which outlined the manufacturers' responsibilities under § 340B. *Id.* In *Astra*, several 340B covered entities sued pharmaceutical manufacturers to enforce the PPAs, alleging that the manufacturers had overcharged them for certain drugs in violation of § 340B. The Court held that because the PPAs merely incorporated the obligations of the statute, "[a] third-party suit to enforce an HHS-drug manufacturer agreement . . . is in essence a suit to enforce the statute itself" and that "[t]he absence of a private right to enforce the statutory ceiling obligations would be rendered meaningless if 340B entities could overcome that obstacle by suing to enforce the contract's ceiling price obligations instead." *Id.* at 1348.

Similar to the statute at issue in *Astra*, Congress did not create a private right of action to enforce the HAMP guidelines. *See, e.g.*, *Hart*, 735 F. Supp. 2d at 748 (citation omitted). Congress instead placed the Secretary of the Treasury in control of implementing foreclosure mitigation efforts and the HAMP guidelines and ensuring compliance with those guidelines. *See* 12 U.S.C. §§ 5219; 5219a. The SPA signed by CitiMortgage was a form contract that merely incorporated the HAMP guidelines issued by the Secretary of the Treasury. (*See* SPA Agreement at 2, Def.'s Mot. to Dismiss Ex. 4.) As in *Astra*, allowing the Allens to bring a third-party suit to enforce the SPA would be a suit to enforce HAMP itself. Because HAMP does not provide a private right of action, the plaintiffs' third-party beneficiary breach of contract claim (Count II) will be dismissed.

### D. Promissory Estoppel (Count III)

The plaintiffs also assert a promissory estoppel claim as an alternative theory of recovery in Count III of the amended complaint. Promissory estoppel is an alternative means of obtaining contractual relief. *See Maryland Transp. Authority Police Lodge No. 34 of the Fraternal Order*

*of Police, Inc. v. Maryland Transp. Authority*, 5 A.3d 1174, 1227 (Md. Ct. Spec. App. 2010)

("[T]here are different ways to prove that a contractual relationship exists. . . . Traditional

bilateral contractual theory is one. Detrimental reliance can be another.") (quoting *Pavel Enters.,*

*Inc. v. A.S. Johnson Co., Inc.*, 674 A.2d 521, 534 (Md. 1996)).[7] The plaintiffs allege that

CitiMortgage made a clear and definite promise that "if they made their temporary loan

modification payments [and] met the criteria for a HAMP modification, then they would receive

a permanent HAMP modification, and that Defendant would not report Plaintiffs as delinquent as

long as they were in compliance with making the agreed-upon payments." (Am. Compl. ¶ 81.)

The Allens also allege that they detrimentally relied on CitiMortgage's promises by relinquishing

other remedies to save their home, such as restructuring their debt under the bankruptcy code,

and by devoting their resources to making the lower monthly payments under the TPP

Agreement. If they had known that they would not qualify for a permanent loan modification or

that CitiMortgage would report them as delinquent to credit reporting agencies for making lower

monthly payments under the TPP, the plaintiffs allege they would have pursued other options,

including possibly selling their home. Accordingly, the defendant's motion to dismiss Count III

will be denied and discovery will be permitted.

### E.      Breach of Fiduciary Duty (Count IV)

In Count IV of the amended complaint, the plaintiffs assert a breach of fiduciary duty

claim against CitiMortgage. The plaintiffs allege that "[a] fiduciary relationship existed between

Plaintiffs, as mortgagors, and Defendant, as the mortgage servicer, as Defendant had a duty to

---

[7] Under Maryland law, a plaintiff alleging promissory estoppels must prove: "(1) a clear and definite promise; (2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) which does induce actual and reasonable action or forbearance by the promisee; and (4) causes a detriment which can only be avoided by the enforcement of the promise." *Pavel Enters.*, 674 A.2d at 532.

act on behalf of Plaintiffs in processing Plaintiffs' loan application." (Am. Compl. ¶ 90.) In Maryland, "[i]t well established that 'the relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between debtor and creditor, and is not fiduciary in nature.'" *Kuechler v. Peoples Bank*, 602 F. Supp. 2d 625, 633 (D. Md. 2009) (quoting *Yousef v. Trustbank Savs., F.S.B.*, 568 A.2d 1134, 1138 (Md. Ct. Spec. App. 1990)). "Courts have been exceedingly reluctant to find special circumstances sufficient to transform an ordinary contractual relationship between a bank and its customer into a fiduciary relationship or to impose any duties on the bank not found in the loan agreement." *Id.* (quoting *Parker v. Columbia Bank*, 604 A.2d 521, 532 (Md. Ct. Spec. App. 1992)). Here, the plaintiffs have failed to plead any special circumstances that would be sufficient to transform their ordinary contractual relationship with CitiMortgage into a fiduciary relationship. Instead, the plaintiffs appear to claim that CitiMortgage breached its alleged fiduciary duty merely because it breached its contractual duties under the TPP Agreement. (*See* Am. Compl. ¶¶ 92-93.) Accordingly, Count IV of the amended complaint will be dismissed.

###        F.       Maryland Consumer Protection Act (Count V)

The Maryland Consumer Protection Act ("MCPA") prohibits "unfair or deceptive trade practices." MD. CODE ANN., COM. LAW § 13-301. The MCPA proscribes fourteen categories of unfair or deceptive trade practices. *See id.* The plaintiffs allege that CitiMortgage violated the MCPA, in part, by making deceptive representations, failing to disclose relevant information, and making false or misleading representations to borrowers with respect to the TPP Agreement. (*See* Am. Compl. ¶ 100(d) and (e).) Because the plaintiffs' MCPA claim sounds in fraud, it is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b). *See Haley*

*v. Corcoran*, 659 F. Supp. 2d 714, 724 n.10 (D. Md. 2009); *Johnson v. Wheeler*, 492 F. Supp. 2d 492, 509 (D. Md. 2007). Rule 9(b) requires a plaintiff to plead "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). These "circumstances" include "the time, place, and contents of . . . false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (quoting 5 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1297 (2d ed. 1990)). Fraud allegations that fail to comply with Rule 9(b) warrant dismissal under Rule 12(b)(6).

The plaintiffs have satisfied the heightened pleading standards of Rule 9(b). The plaintiffs have pled the dates and contents of numerous contradictory letters sent by CitiMortgage that they allege were both misleading and false. According to the amended complaint, CitiMortgage sent its first misleading written statement in August 2009, stating that the Allens' TPP Agreement was to begin on September 13, 2009, despite the fact that they had been making lower monthly payments to CitiMortgage since June 2009. (*See* Am. Compl. ¶ 37.) On September 10, 2009, the Allens received another written statement informing them that their TPP Agreement had been cancelled, which the defendant's representative allegedly admitted was sent in error. (*Id.* at ¶ 38.) On December 28, 2009, while they were participants in the TPP program, the Allens also received a notice from CitiMortgage that their account was delinquent in the amount of $8,328.42. (*Id.* at ¶ 40.) The Allens received a similar notice on February 15, 2010, stating that their account was delinquent in the amount of $11,599.02 even though they were current with their TPP Agreement payments. (*Id.* at ¶ 42.) Despite these two delinquency notices, the Allens received notice on February 25, 2010, that their loan modification application

was denied because they were current on their mortgage and were not at risk of default. (*Id.* at ¶ 43.) Finally, on March 8, 2010, the Allens received a request from CitiMortgage that acknowledged their request for a permanent loan modification and asked for additional financial information to process such a request, leading them to believe that the defendant was reconsidering its initial denial of their loan modification. (*Id.* at ¶ 44.) These letters, when taken in combination, allege with sufficient particularity a claim that CitiMortgage sent false or misleading statements to the Allens that had the capacity, tendency, or effect of deceiving or misleading them about their status under the TPP program and whether their mortgage was in default. *See* MD. CODE ANN., COM. LAW § 13-301(1).

The defendants move to dismiss the plaintiffs' MCPA claims, arguing that the Allens have failed to allege any damages arising from practices deemed unlawful by the MCPA. Under the MCPA, an individual may only bring a claim if she can "establish the nature of the actual injury or loss that he or she allegedly sustained as a result of the prohibited practice." *Lloyd v. General Motors Corp.*, 916 A.2d 257, 280 (Md. 2007) (quoting *Citaramanis v. Hallowell*, 613 A.2d, 964, 968 (Md. 1992)). The plaintiffs have alleged that CitiMortgage's misleading letters led to the following damages: damage to Mrs. Allen's credit score, emotional damages, and forgone alternative legal remedies to save their home. Accordingly, at this stage, the plaintiffs have stated sufficiently an actual injury or loss as a result of a prohibited practice under the MCPA. The defendant's motion to dismiss will therefore be denied as to Count V.

**G.    Maryland Consumer Credit Reporting Agency Act & Fair Credit Reporting Act (Counts VI & VII)[8]**

Congress enacted the Fair Credit Reporting Act ("FCRA") "to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy." *Saunders v. Branch Banking & Trust Co. of Virginia*, 526 F.3d 142, 147 (4th Cir. 2008) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007)). In addition to duties imposed on credit reporting agencies, the FCRA imposes certain duties on the "furnishers of information," including entities like CitiMortgage, that provide credit information to reporting agencies on a routine basis. *See* 15 U.S.C. § 1681s-2(a)-(b). The plaintiffs allege that CitiMortgage violated the Fair Credit Reporting Act ("FCRA") when it willfully refused to correct its report to credit reporting agencies that Mrs. Allen was delinquent on her mortgage payments. (*See* Am. Compl. ¶¶ 112-13.) The plaintiffs do not identify the specific section of the FCRA CitiMortgage allegedly violated. Because the Fourth Circuit has held that the FCRA explicitly bars consumers from bringing private suits for violations of § 1681s-2(a), *see Saunders*, 526 F.3d at 149 (citing § 1681s-2(c)), the court will assume the plaintiffs are asserting a claim under § 1681s-2(b).

Section 1681s-2(b) of the FCRA requires a furnisher of information to follow certain procedures to ensure the accuracy of information provided to a credit reporting agency, but only "[a]fter receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency."[9] 15 U.S.C. § 1681s-2(b). Although the Fourth Circuit has not yet ruled on this issue,

---

[8] Because the Maryland Consumer Credit Reporting Agencies Act ("MCCRAA") contains virtually identical provisions to the FCRA, the Fourth Circuit has addressed separate claims brought under both the MCCRAA and FCRA as one. *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899-900 (4th Cir. 2003).

[9] Section 1681i(a)(2) requires a consumer reporting agency to notify an information furnisher of a dispute from a consumer within five business days of when the consumer reports the dispute. *See* 15 U.S.C. § 1681i(a)(2).

other courts have held that, under the statutory language of § 1681s-2(b), a furnisher of information has no duty to investigate a credit dispute if a consumer directly notifies it of a dispute. *See Peasley v. Verizon Wireless (VAW) LLC*, 364 F. Supp. 2d 1198, 1200 (S.D. Cal. 2005) ("[F]or the duty imposed by § 1681s-2(b) to be triggered, the furnisher of information must have received notice of the dispute from a consumer reporting agency, not from the consumer." (citing *Whisenant v. First Nat'l Bank & Trust Co.*, 258 F. Supp. 2d 1312, 1316 (N.D. Okla. 2003)); *Young v. Equifax Credit Information Servs., Inc.*, 294 F.3d 631, 639-40 (5th Cir. 2002); *Stafford v. Cross Country Bank*, 262 F. Supp. 2d 776, 783-84 (W.D. Ky. 2003))).

Here, the plaintiffs allege that they contacted both the credit reporting agencies and CitiMortgage directly about the inaccuracy in Mrs. Allen's credit report. (Am. Compl. ¶ 51.) The plaintiffs also allege that both the credit reporting agencies and CitiMortgage refused to alter Mrs. Allen's credit score after they reported the inaccuracy. (*Id.* at ¶¶ 51, 57.) The plaintiffs, however, failed to allege that CitiMortgage was ever notified by a credit reporting agency that the Allens disputed the accuracy of information on Mrs. Allen's file. Thus, the plaintiffs have failed to state a claim for a violation of § 1681s-2(b). *See Peasley*, 364 F. Supp. 2d at 1200 ("The first amended complaint does not allege that Verizon was ever notified by a credit reporting agency . . . . Thus, the complaint fails to state a claim for violation of § 1681s-2(b) upon which relief can be granted.")[10] The defendant's motion to dismiss Counts VI and VII will be granted.[11]

---

[10] *See also Givens v. CitiMortgage, Inc.*, No. 10-1249, 2011 WL 806463, at *3 (D. Md. Feb. 28, 2011) (dismissing the plaintiff's § 1681s-2(b) claim even though he reported a discrepancy to the credit reporting agencies because he failed to allege that that a credit reporting agency notified defendant of the dispute).

[11] The defendant also challenges Mr. Allen's statutory standing to sue under the FCRA based on his wife's credit report. (*See* Def.'s Reply at 7 n.6.) Because the court will dismiss the plaintiffs' FCRA claim under Rule 12(b)(6), it need not address whether Mr. Allen has statutory standing under the FCRA. *See Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 416 n.5 (2004) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 97 n.2 (1998)).

The plaintiffs, however, will be granted leave to amend Counts VI and VII if there is a factual basis to support such an amendment.

**H.      Declaratory and Injunctive Relief (Counts VIII and IX)**

In Counts VIII and IX, the Allens seek declaratory and injunctive relief. Because a number of the plaintiffs' claims remain at this time, the court will deny the defendant's motion to dismiss these counts at this time.

<u>**CONCLUSION**</u>

For the foregoing reasons, the defendant's motion to dismiss will be granted as to plaintiffs' SPA breach of contract, breach of fiduciary, MCCRAA, and FCRA claims. The defendant's motion will be denied as to the plaintiffs' TPP Agreement breach of contract, promissory estoppel, MCPA, and declaratory and injunctive relief claims. A separate Order follows.

<u>August 4, 2011</u>                                              _____/s/_____
Date                                                                    Catherine C. Blake
                                                                           United States District Judge